IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DEBBIE A. WHITE, | ) | 8:05CV314 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| BOYS TOWN NATIONAL | ) | |
| RESEARCH HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |

   This matter is before court on Defendant's motion for summary judgment (filing 23). Plaintiff has failed to respond to the motion,[1] and, pursuant to our local rules,[2] I deem Defendant's statement of material facts to be admitted by Plaintiff. That is, it is undisputed that:

   1. Plaintiff Debbie A. White ("White") is an African-American female who was diagnosed with multiple sclerosis in April of 2003.

---

[1] The motion for summary judgment was filed on June 23, 2006. Plaintiff's response was due on July 17, 2006. See NECivR 6.1(b) & 56.1(b)(2).

[2] The party opposing a motion for summary judgment shall include in its brief a concise response to the moving party's statement of material facts. The response shall address each numbered paragraph in the movant's statement and, in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies. Properly referenced material facts in the movant's statement will be deemed admitted unless controverted by the opposing party's response.

NECivR 56.1(b)(1) (emphasis in orginal).

2. From 1980 through the end of 2002, White worked as a medical assistant for Physicians Clinic. Eighteen of her years at Physicians Clinic were spent working in the pediatrics area, and her remaining tenure was spent in the ear/nose/throat ("ENT") area.

3. When several of the doctors with whom White worked at Physicians Clinic moved to Boys Town, White sought employment at Boys Town as well. Part of the application process involved an interview with Jan Villwok ("Villwok"), Boys Town's Director of Ambulatory Nursing and the individual who would directly supervise White. During this interview, Villwok explained to White that the Boys Town environment demanded a one nurse or medical assistant to one doctor ratio and it was a requirement of the job that White be able to work in a one-to-one ratio with her assigned doctor. White understood that the clinic settings in which she would be working dealt with a large volume of patients on a daily basis and that the medical assistant or nurse working with a doctor was required to work quickly, efficiently, and independently in order to keep the patients moving smoothly through the clinic on schedule and to assure that the physician had everything required to properly care for the patients. During the interview, White informed Villwok that she was comfortable working with computers.

4. On December 16, 2002, White began work as a medical assistant for Boys Town. Her duties at Boys Town included checking in patients, taking patient histories for the physician with whom she was working, assisting the doctor during examinations, drawing up and giving vaccinations, taking hemoglobin, holding pediatric patients while administering shots, and setting up the Strobe and other equipment for the doctors. White admits that the work at Boys Town was very fast paced, that patients were scheduled close together, that it was important for her to be able to work efficiently and move quickly from patient to patient, and that she needed to be able to do her job without having to consult or confer with others on a regular basis. White also acknowledges that patient safety in the clinic was of paramount importance and depended in part on her performance of her job duties.

5. White was initially assigned to work one on one with the ENT doctors and received over 100 hours of ENT orientation, an amount of orientation well above that typically required by new hires who came to Boys Town without the years of experience that White had. From the inception of her employment, White had difficulty keeping up with the pace required at Boys Town and also struggled with setting up the Strobe, a specialized piece of equipment used in the ENT area. In fact, White admittedly had trouble keeping up with the ENT doctor's patient flow when she had to set up the Strobe, having to ask the nurse manning the phones to finish set up so she could keep patients flowing. White also could not rotate to work as the phone nurse (the nurse who took phone calls from patients) because she did not type quickly enough to document the conversation. Despite the fact that she received specialized typing training on at least two separate occasions and believes she did "fair" during those training sessions, White's skills in this area admittedly did not improve to the point that she could be rotated onto phone. Significant problems were also noted in White's techniques and in the length of time she required to take patient histories.

6. In an effort to address the performance problems White was experiencing, White was rotated to different clinic settings, working briefly in orthopedics and then being rotated to the pediatric side in March of 2003. Again, White's orientation in pediatrics was significantly lengthier than the orientation typically required for employees with her level of experience, involving over 124 hours of orientation. White's co-workers continued to report to Villwok that White was not working quickly enough to keep patients flowing and that she needed to be retrained each time she went to clinic.

7. In late March of 2003, White experienced vision problems (including blindness in her left eye ) that eventually led to an April 2003 diagnosis of multiple sclerosis ("MS"). While White disclosed her diagnosis to Shelley, the person at Boys Town to whom she was to report absences, White did not personally disclose this information to Villwok, her supervisor, until June 12, 2003. On June 12, 2003, White was placed on paid leave and asked to obtain a fitness for duty evaluation from Dr. West.

8. White saw Dr. West on June 16, 2003, and gave him the history of her MS diagnosis. Dr. West completed a one-page report following this visit in which he stated that White could perform her duties if she could work at a slower pace. White acknowledges she told Dr. West that speed and efficiency were an important part of her job and that working at a slower pace could cause a significant disruption to the operations of the clinic and the flow of patients.

9. After receiving Dr. West's very brief report, Villwok called him on June 19, 2003, to request further information. During that conversation, Dr. West informed Villwok that, in addition to working at a slower pace, White was also having problems with blurred vision in her left eye, demonstrated slight gait problems, was slow in processing, and felt a need to confirm lab or other test results with other nursing staff members. Dr. West also informed Villwok that White would need "backup" in order to function in a nursing capacity at Boys Town.

10. Dr. West's evaluation raised significant concerns for Villwok because working at an efficient pace rather than a slow pace and working without backup are essential functions for medical assistants working in the Boys Town clinics, because of the disruption to clinic operations caused by a nurse or medical assistant who cannot keep up with patient volume and work independently, because of the risk to patient safety posed by White's condition as described by Dr. West, and because of the continued performance problems noted by White's co-workers.

11. On June 23, 2003, therefore, White and Villwok met to discuss Villwok's concerns, and Villwok advised White that Boys Town no longer had a medical assistant position available for White. White was allowed to seek advice from her own physician prior to any action being taken. On July 1, 2003, White submitted her resignation, effective July 4, 2003, stating that, due to her MS diagnosis, she was "unable to perform at the pace Boys Town would expect".

12. When White submitted her resignation, she did so with the intention of applying for disability benefits through the Social Security Administration, which she did in July of 2003. In her application, White

4

stated that, since June 12, 2003, she had been unable to engage in any type of substantial and gainful work activity due to MS. An Administrative Law Judge ("ALJ") ultimately found that, based on the evidence presented by White's physicians and by White herself, her impairment had "imposed significant limitations upon her ability to function" since June 12, 2003, and that White has been disabled since that date. The ALJ awarded White disability benefits retroactive to June 12, 2003. In so finding, the ALJ stated:

> [White] could not, in any competitive setting, sit (or alternate sitting and standing) throughout the course of a typical eight hour work day without frequent rest, perform tasks requiring bilateral manual dexterity or visual acuity, sustain attention, tolerate work pressures generally associated with the production requirements of most labor, achieve production goals, perform work of an acceptable quality and/or maintain a regular schedule. In view of these limitations, [White] has been unable to return to her past relevant work as a medical assistant, and . . . [White] is found "disabled" within the meaning of the Social Security Act, as amended.

White agrees that each of these limitations as noted by the ALJ posed a safety risk for patients in the Boys Town clinics.

13. Additionally, included in the materials the ALJ reviewed and on which the ALJ relied was a report from White's neurologist, Dr. Franco, in which he stated that:

> [S]ince April of 2003, [White] has had the following limitations due to multiple sclerosis: significant balance difficulty and left leg weakness despite anti-spasticity medications, with occasional falls; fatigue with prolonged standing; poor depth perception with intermittent double vision; lifting limitations due to weakness of the left arm and leg, fatigue with sustained lifting, a proneness to fall, and a lifting limitation of no more than 15 pounds; slow, mildly slurred speech secondary to ataxic dysarthria; and mildly slowed thought processes.

5

White agrees that the ALJ accurately presented, in White's opinion, the contents of Dr. Franco's report, that Dr. Franco is the neurologist who treats White's MS, that Dr. Franco's source of information for his report to the ALJ would have been his visits with White and his examinations of her, and that Dr. Franco reported accurately what White's symptoms were in April of 2003.

14. White admits that mildly slowed thought processes, intermittent double vision, fatigue from standing, poor depth perception, lifting limitations, and weakness in her left limbs would pose safety concerns for patients in the Boys Town clinics.

15. Following her resignation, White also sought long term disability benefits under Boys Town's Long Term Disability Policy ("Policy"). The Policy has a "Benefit Waiting Period" of 180 days, ….[3]

16. On June 29, 2005, after the ALJ issued her opinion finding White totally disabled since June 12, 2003, White filed this action. In her Complaint, White alleges that Boys Town violated the Americans with Disabilities Act ("ADA") by failing and refusing to make reasonable accommodations for White's disability and by constructively discharging her; that Boys Town discriminated against White on the basis of her race because Boys Town made reasonable accommodations for white disabled individuals and did not constructively discharge them; and that Boys Town intentionally interfered with her attainment of long term disability benefits in violation of the Employee Retirement Income Security Act ("ERISA") by placing her on paid leave of absence on June 12th.[4]

---

[3] The remainder of this paragraph has been deleted because it consists of legal conclusions that are not deemed admitted by White.

[4] In her complaint, White also alleges that Boys Town violated the Nebraska Fair Employment Practice Act, but the parties' Rule 26(f) planning conference report (filing 11) does not reference the NFEPA. In any event, the Nebraska Supreme Court analyzes NFEPA claims in the same manner that federal courts analyze ADA and Title VII claims. See Orr v. Wal-Mart Stores, Inc., 297 F.3d 720, 723 (8th Cir. 2002) (ADA); Malone v. Eaton Corp., 187 F.3d 960, 962 n.3 (8th Cir. 1999) (Title VII).

Defendant's Brief (filing 25) at 2-12 (footnotes and citations to record omitted).

### *I. DISCUSSION*

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). See also Egan v. Wells Fargo Alarm Servs., 23 F.3d 1444, 1446 (8th Cir.1994). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8th Cir. 1999). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." Id. Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Rule 56(e) provides that, when a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324.

Summary judgment is disfavored in employment discrimination cases, as such cases are "inherently fact-based." Mayer v. Nextel West Corp., 318 F.3d 803, 806 (8th Cir.2003) (quoting Keathley v. Ameritech Corp., 187 F.3d 915, 919 (8th Cir.1999)). Nonetheless, summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case. Simpson v. Des Moines Water Works, 425 F.3d 538, 542 (8th Cir. 2005).

### *A. ADA Claim*

To establish a prima facie case under the ADA, White must demonstrate (1) her condition qualifies as a disability within the meaning of the ADA, (2) she is qualified to perform the essential functions of her position with or without a reasonable accommodation, and (3) she has suffered an adverse employment action due to her disability. Samuels v. Kansas City Missouri School Dist., 437 F.3d 797, 801 (8th Cir. 2006). Boys Town argues that White cannot establish the second element.

8

An essential function "means the fundamental job duties of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of the position." Moritz v. Frontier Airlines, Inc., 147 F.3d 784, 787 (8th Cir.1998) (quoting 29 C.F.R. § 1630.2(n)(1)). An essential function may be established by evidence that includes: (1) "[t]he employer's judgment as to which functions are essential"; (2) "[w]ritten job descriptions prepared before advertising or interviewing applicants for the job"; (3) "the amount of time spent on the job performing the function"; (4) "the consequences of not requiring the incumbent to perform the function"; and (5) "the current work experience of incumbents in similar jobs." Id. (quoting 29 C.F.R. § 1630.2(n)(3)).

In this case, it is undisputed that essential functions of the medical assistant's duties at Boys Town involved working in a one-to-one ratio with doctors, that it was critical to the functioning of the clinics that a medical assistant be able to work rapidly to keep patients flowing in the clinic's tightly packed schedule, and that it was of paramount importance that a medical assistant be able to ensure the safety of patients while in her care. Villwok informed White of these requirements when White was interviewed, and White offers no evidence to contradict Boys Town's position that these were essential functions of White's job. It is also undisputed that White could not perform these essential functions of her job with or without reasonable accommodation.

White swore in her application for disability benefits that she was unable to work in any capacity by June 12, 2003, proffered evidence from Dr. Franco to the ALJ which listed in detail all of the limitations which prevented her from working, and stated in her deposition that Dr. Franco accurately described her limitations as of April 2003 and that these limitations posed significant patient safety issues.

> The Supreme Court has established that "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim." Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 797, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). Moreover, there is no

9

> "special legal presumption" restricting a person who is receiving SSDI benefits from bringing an ADA claim. Id. at 805, 119 S.Ct. 1597. Still, in order to successfully maintain an ADA suit, such a plaintiff must "proffer a sufficient explanation" for the "apparent contradiction." Id. at 806, 119 S.Ct. 1597.

Voeltz v. Arctic Cat, Inc., 406 F.3d 1047, 1050 (8th Cir. 2005). White has not shown that she might overcome this difficult evidentiary problem.

The possibility of a reasonable accommodation is also part of White's initial burden when presenting her prima facie case of disability discrimination. See Moritz, 147 F.3d at 788. White has not made such a showing.[5] "It is well settled that an employer is under no obligation to reallocate the essential functions of a position that a qualified individual must perform." Id. Furthermore, Boys Town is not obligated to hire additional employees or reassign existing workers to assist White in her duties as a medical assistant. See id.

Because White has not shown that her work performance met the employer's legitimate job expectations, with or without reasonable accommodation, she is not "qualified individual" entitled to ADA protection. See Mole v. Buckhorn Rubber Products, Inc., 165 F.3d 1212, 1217 (8th Cir. 1999).

### *B. Title VII Claim*

Absent direct evidence of discrimination, Title VII and § 1981 claims are analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Maxfield v. Cintras Corp. No. 2, 427 F.3d 544, 550 (8th Cir. 2005). Under the McDonnell Douglas framework, a plaintiff first has to establish

---

[5] White merely testified that she wanted Boys Town to do "[w]hatever would have been necessary for [her] to continue to . . . perform [her] job . . . ." (White dep., at 138:5-6 (filing 24-2, at 24).)

a prima facie case by showing that she: (1) is a member of a protected group; (2) was meeting the legitimate expectations of the employer; (3) suffered an adverse employment action; and (4) under circumstances permitting "an inference of discrimination." Id. (quoting Zhuang v. Datacard Corp., 414 F.3d 849, 854 (8th Cir. 2005)). If the plaintiff establishes a prima facie case, the defendant must articulate a legitimate, nondiscriminatory reason for the action. Id. If the defendant does so, the plaintiff must offer evidence showing that the defendant's legitimate reason is merely a pretext for discrimination. Id. Boys Town only argues that White cannot prove the fourth element of the prima facie case.[6]

White can prove the fourth element of the prima facie case by putting forth facts that similarly situated Boys Town employees, who are not African-American, were treated differently. See Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 850-51 (8th Cir. 2005). At the prima facie stage of the McDonnell Douglas burden-shifting framework, a "low threshold" applies for employees to be considered similarly situated. Id., at 851. See also Wheeler v. Aventis Pharmaceuticals, 360 F.3d 853, 857 (8th Cir.2004) (at the prima-facie stage, the "similarly situated" test is "not onerous," but at the pretext stage, it is "rigorous").

At her deposition, White could only offer as proof of racial discrimination the fact that a white nurse experiencing similar symptoms (but not diagnosed with MS) was allowed to work the phones instead of working directly with patients. (White dep., at 138:24-140:24 (filing 24-2, at 24).) This evidence is inadmissible hearsay to

---

[6] Although I have already determined that White did not meet her employer's legitimate expectations, this adverse finding does not necessarily prevent her from proving a prima facie case. See Schmittou v. Wal-Mart Stores, Inc., No. Civ. 011763, 2003 WL 22075763, *4 (D.Minn. Aug. 22, 2003) (rejecting employer's argument that employee discharged for poor attendance did not meet applicable job qualifications, since this would improperly conflate the 3 steps of the McDonnell Douglas analysis).

11

the extent that it is based on statements that the unnamed nurse made to White,[7] but even if it could be considered, it does not create a reasonable inference of discrimination. It is undisputed that White lacked the requisite typing skills to do telephone work. Without some evidence that the nurse likewise was unqualified to work the phones, the fourth element of the prima facie case is not satisfied.

Even assuming that White could establish a prima facie case, I find that Boys Town articulated a legitimate, nondiscriminatory reason for White's placement on paid leave and the ensuing constructive discharge, and that there is no evidence of pretext. As discussed in the preceding section of this opinion, it is undisputed that White, because of her disability, was not qualified to work as a medical assistant at Boys Town.

### C.  ERISA Claim

Finally, White alleges that she would have become eligible for long-term disability benefits on June 16, 2003 (her 6-month anniversary of employment), if only Boys Town had not placed her on paid leave before that date. She apparently claims that Boys Town violated 29 U.S.C. § 1140, which makes it unlawful for "any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the [employee benefit] plan." 29 U.S.C.A. § 1140 (West 1999).

To succeed on this claim, White will need to prove that Boys Town placed her on paid leave with the "specific intent" to interfere with her alleged entitlement to

---

[7] White testified that "[t]here was a nurse that worked out at Maple Street that told me that she was going through similar symptoms and testing that I had gone through, but had not been given a diagnosis[.]" (White dep., at 139:7-10.)

long-term disability benefits.  See Koons v. Aventis Pharmaceuticals, Inc., 367 F.3d 768, 777 (8th Cir. 2004) (citing Jefferson v. Vickers, Inc., 102 F.3d 960, 964 (8th Cir. 1996).  This specific intent is present where the employee's (future or present) entitlement to protected benefits is a motivating factor in the employer's decision. Id. (also explaining that the term "motivating factor," as used in this context, means "determinative factor").  In other words, White needs to show that she would not have been placed on leave had she not been entitled to the benefits.  See id.  The question of the employer's intent in this situation is also subject to the McDonnell Douglas burden-shifting analysis.  See id.  Here, however, Boys Town argues as a matter of law that the period of paid leave did not affect White's entitlement to long-term disability benefits.  I agree.

It is undisputed that White satisfied the 6-month "eligibility waiting period" that applies to Boys Town's employees.  As defined in the long-term disability insurance policy, "[t]he Eligibility Waiting Period is the period of time the Employee must be in Active Service to be eligible for coverage."  (Filing 24-5, at 17.) Significantly, "[a]n Employee will be considered in Active Service on a day . . . she is actively at work [and] . . . [during a] period of Employer approved paid leave of absence."  (Id., at 31.)  Thus, even though White was placed on paid leave as of June 12, 2003, she remained in "active service" and her eligibility date was not affected.  She became eligible for long-term disability coverage on July 1, 2003 (the first day of the month following 6 months of active service), while she was still employed at Boys Town.  (Filing 24-5, at 2, 7.)  White's claim to the contrary is wrong as a matter of law.[8]

---

[8] It is alleged in paragraph 39 of the complaint that "[a]s a result of Boys Towns' placement of Mrs. White on paid leave of absence on or about June 12, 2003, she was not considered to be in active employment status."  (Filing 1, at 7.)

13

Boys Town argues that the reason White did not receive long-term disability benefits is that she could not meet the policy's 180-day "benefit waiting period." (Id.)  This is "the period of time an Employee must be continuously Disabled before Disability Benefits may be payable." (Id., at 19.) Boys Town construes this language to mean that a disabled employee must remain on its payroll for a continuous period of 180 days after the onset date of disability in order to qualify for benefits.[9]  I need not decide whether this interpretation of the policy is correct,[10] because it is irrelevant to the claim presented.

### III. CONCLUSION

White is unable to establish a prima facie ADA case because there is no evidence that she is qualified to perform the essential functions of her position with or without a reasonable accommodation.  White is unable to establish a prima facie Title VII case because there is no direct evidence of racial discrimination, and no admissible circumstantial evidence that a similarly situated white employee was treated differently; Boys Town has also articulated a legitimate, nondiscriminatory reason for its action, and there is no evidence that such reason is pretextual.  White is unable to establish a prima facie ERISA case because she has misconstrued the "eligibility waiting period" requirement contained in Boys Town's long-term disability insurance policy; contrary to White's allegations, she was not rendered

---

[9] In this regard, Boys Town has presented evidence that White had exhausted all of her paid leave and, because she had not been an employee for at least 1 year, was not eligible for an extended unpaid leave of absence that would allow her to satisfy the 180-day benefit waiting period.

[10] The policy provides that "[t]he insurance on an Employee will end on the . . . date the Employee is no longer in Active Service[,]" but also contains a "continuation of insurance" clause which provides that "Disability Insurance continues if an Employee's Active Service ends due to a Disability for which benefits under the Policy are or may become payable." (Filing 24-5, at 18, 19.)

ineligible for disability benefits by reason of being on paid leave on her 6-month anniversary date.

Accordingly,

IT IS ORDERED that Defendant's motion for summary judgment (filing 23) is granted.  Judgment shall be entered by separate document.

July 25, 2006.                              BY THE COURT:

                                            s/ *Richard G. Kopf*
                                            United States District Judge